Filed 5/13/24  P. v. Hoang CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MERRIC HOANG,<br><br>    Defendant and Appellant. | D083715<br><br><br><br>(Super. Ct. No. FWV20003718) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Katrina West, Judge.  Affirmed.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene Sevidal, James Toohey, and Arlyn Escalante, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Merric Hoang guilty of false imprisonment by violence against Jane Doe 3 (Pen. Code,[1] § 236, count 1); and of misdemeanor sexual battery against Jane Doe 1 (§ 243.4, subd. (e)(1), counts 2 & 3).[2] Hoang committed these offenses against the victim employees while working as a restaurant manager. The trial court sentenced Hoang to 22 months in prison.

On appeal, Hoang contends the trial court: (1) abused its discretion when it ruled to admit evidence of his uncharged sexual conduct against two additional female employees who worked at the restaurant at or near the same time as the victims; and (2) failed to instruct sua sponte on count 1 on the lesser included offense of misdemeanor false imprisonment.

As we explain, we reject these contentions and affirm the judgment.

## FACTUAL BACKGROUND

A. *Doe 1*

Doe 1 began working at a restaurant located in Upland, California (Restaurant), in about August 2019, when she was 17 years old and entering her senior year in high school. Hoang hired her and she worked under his supervision for about a year, until she quit. The Restaurant was owned by Ignacio Gaytan, who was sometimes on the premises.

About three weeks after starting her employment, while alone with Hoang after the Restaurant had closed, he kissed her on the forehead. She

---

[1]    Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]    The jury deadlocked on count 4, misdemeanor annoying or molesting of a child, involving 17-year-old Jane Doe 2. (§ 647.6, subd. (a)(1).) The trial court declared a mistrial on this count and the prosecution subsequently dismissed it at sentencing.

was startled by the kiss, felt "uncomfortable," but said nothing. Hoang also started kissing her on the cheek. She estimated he kissed her about 100 times on the cheek during the year she worked at the Restaurant. In each instance she tried to move away from him and told him to " '[s]top.' " As time went on, Hoang also tried to kiss her on the lips. She estimated he did so about 10 or 15 times. At no time did she kiss him back, or present herself to be kissed. He also would ask her for a kiss, which she always refused.

Hoang also became more "touchy" with her at work. Initially, he would merely touch her shoulder, but then started touching her "lower and lower" on her back, pretending it was an "accident." He also touched through her clothing her waist, "butt," and "front part," which she described as her vagina. She estimated Hoang touched her buttocks about 35 to 40 times; that when he did so she would move away from him; and that as it continued, she stopped "freezing up" and started telling him to leave her alone.

About three months before she quit working at the Restaurant, Hoang came up behind her as she was leaning against a counter and started rubbing his erect penis in "between her butt." She felt "scared," "wanted to cry," and "froze up," not knowing how to respond. She estimated Hoang rubbed his penis in between her buttocks between five and 10 times. As these incidents continued, she told Hoang to stop and threatened to tell Gaytan, the Restaurant owner.

She estimated that Hoang through her clothing touched her vagina on two occasions. Immediately after the first incident, she went to the bathroom and "freak[ed] out." The second incident occurred while she was in the Restaurant office, away from public view. While sitting in a chair counting tips for the delivery drivers, Hoang entered the office, leaned behind her, put

3

his hand on her thigh, then moved it to her vagina. She estimated this touching went on for about a minute.

Hoang also made sexually explicit comments to her. He told her he wanted to "touch," "feel," and "taste [her]"; and asked how much she would charge to have " 'sex' " with him. She felt "[w]orthless" when he made these comments.

Near the end of her employment, she became "extremely . . . angry" at Hoang. He responded by trying to placate her, and at one point asked if she had " 'told anyone about us.' " She in fact had spoken to her coworkers about Hoang's conduct, including J.S., K.S., and Doe 2, as well as to the Restaurant owner. Doe 1 also told her mother, who responded by getting a job at the Restaurant working alongside her daughter.

Doe 1 remained working at the Restaurant because she needed the money and the pandemic made it difficult to find alternate employment. However, in July 2022 she obtained new employment at another restaurant in Upland. After leaving the Restaurant, Hoang continued to call and message her, leading her to block his number. With her help, J.S. also got a job at the new restaurant.

On J.S.'s first day of work, as she and Doe 1 were leaving together at about 9:00 p.m., they saw Hoang across the street, sitting in his car. They immediately walked to Doe 1's car, got inside, and Doe 1 locked the doors. He approached the driver's side and tried the door handle. When the door would not open, he tapped on the window. Doe 1 put the car in reverse and drove away. Hoang followed them for a while, causing Doe 1 to "panic[ ]." She reported this incident to police later that night.

4

B. *Doe 2*

Doe 2 began working at the Restaurant in April 2019, when she was 17 years old. Hoang hired and managed her during her eight-month employment.

One morning in November 2019 while at work, she attempted to grab a bowl located on a shelf, causing other items to fall on the floor. Hoang heard the commotion and came to her assistance. While standing behind her, he pressed the lower half of his body against her, grabbed the bowl, and then tried to kiss her. As he pressed against her for about 30 seconds, she felt his penis against her buttocks, making her feel "trapped" and "[v]ery uncomfortable." When she finally was able to free herself, she told him, " 'Please don't do that. It's not right. I'm a minor.' " A short time later, she went home and told her mother what had happened. They reported the incident to police.

C. *Doe 3*

Doe 3 was 21 years old in July 2017 when Hoang hired her. She worked at the Restaurant for about a year, and reported directly to him.

One morning in April 2018 as she was busy at work, Hoang made "[i]nappropriate comments" to her including asking whether she would agree to have sex with him and how many "guys [she had] slept with." He had made similar comments to her in the past, including asking her if she had taken a condom from his car that he had used to "jack[ ]off" while viewing her photograph on his cellphone. On this particular day, she decided she had had enough and began to leave the Restaurant through the backdoor.

As she headed toward the door, Hoang ran up from behind, grabbed both of her arms, and held her tight. Scared, she unsuccessfully tried to punch and kick him to free herself, while repeatedly telling him to let her go.

Hoang continued to restrain her for what she felt was a "long time," using his size, weight, and strength to his advantage. As she fought to free herself from his grasp, Hoang held her even *tighter*. As a result of the incident, she sustained bruises on her arm.

At some point Hoang let her go. She immediately left the Restaurant, went home, and told her family what he had done. About an hour after the incident, Hoang began text messaging her. He wrote, " 'I'm really sorry for what happened. I really didn't mean to hurt you.' "; " 'Give me one chance. One.' "; " 'I admit I was too aggressive. I'll stay out of the boundaries.' "; and " 'I know you've gave me one chance before. Give me one last chance to prove myself. I'll not lay a hand on you again.' " Hoang continued to send her messages for about a week after the incident, again apologizing for " 'hurt[ing]' " her.

She returned to work about a week later because she and her family needed the money. She eventually left the Restaurant in July 2018 because she was "scared" of Hoang.

In the weeks and months that followed, Hoang continued to message her and contact her through social media. On her birthday, he left a card with a handwritten note, chocolate, and flowers on her car.

Doe 3 eventually found new employment at another restaurant. In November 2020 Hoang unexpectedly showed up while she was working, causing her severe emotional distress. A few days after this incident, feeling scared and traumatized by Hoang, she went to police and filed a report that included the April 2018 incident. About a week later, she returned to the station and viewed videos of that incident recorded by surveillance cameras

6

inside the Restaurant.  The videos, and two photographs taken from them, were shown to the jury.[3]

D.  *J.S.*

J.S. was 17 years old when she starting working at the Restaurant in October 2019.  After a few weeks, and despite it being her first job ever, she was promoted to assistant manager.  About a week after she started working, Hoang began touching her buttocks, thighs—"up to [her] private area," and breasts.  He also kissed her on the cheek and neck.  This touching would occur during "every shift."  At times he also would come up behind her, hold her tight, and press his penis into her "butt area."

She saw Hoang acting inappropriately at the Restaurant with fellow employees Doe 1 and K.S.  Regarding Doe 1, J.S. on at least 20 occasions saw him corner her in a back room, graze her "breast and butt area," and get "in her personal space."  Regarding K.S., J.S. saw him kiss her at least 10 times.  J.S. left the Restaurant in July 2020 and went to work at the same restaurant as Doe 1.

On her first day of work, after she and Doe 1 had completed their shifts, they walked outside and saw Hoang sitting in his car.  He had been messaging J.S. all day, asking her if she liked her new job and if they could meet after work.  J.S. and Doe 1 walked to Doe 1's car and got inside.  Hoang approached, knocked on the window, and asked if they could " '[p]lease' " go to dinner.  Scared, they ignored him and drove away, with him following behind.  At one point he pulled alongside of their car and tried to talk to them.  As they drove, Hoang continued to message J.S.

---

[3]    Neither the videos nor the photographs were included in the record.

E. *K.S.*

K.S. was 17 years old when she started working at the Restaurant in November 2019; she quit about six months later. During one of her shifts she saw Hoang trying to kiss Doe 1. His behavior "scared" K.S.

On another occasion after their shifts had ended, she accompanied Hoang on an "errand." During the drive in his car he became "very touchy." Later that night while parked, he pulled down her top and put his mouth on her breast. He also unbuckled her jeans, put his hand part way down her pants, and asked, " 'Do you want to go in the back or something?' " She said no and demanded to be taken home.

Although scheduled to work the following day, she remained home. Hoang started calling her but she did not answer. Later that morning while in her bedroom, she heard him outside, calling her name. Hoang knew where she lived because he sometimes would drive her home after work. She was "alarmed" by his unannounced appearance outside her home.

A few months later she started working at an ice cream shop. During one of her shifts, Hoang unexpectedly entered the shop, approached her, and asked where the bathroom was located. His sudden appearance at her work caused her emotional distress, and led to her decision to file a police report.

## DISCUSSION

A. *Evidence of Uncharged Sexual Conduct on Counts 2, 3, and 4*

Hoang contends the trial court abused its discretion in admitting the testimony of J.S. and K.S., arguing the evidence was inadmissible under Evidence Code sections 1108 and 352. We disagree.

1. Additional Background

During in limine motions, the prosecution moved under Evidence Code section 1108 to admit the anticipated testimony of J.S. and K.S. Hoang

8

claimed their testimony was inadmissible, arguing that J.S.'s proposed testimony would be cumulative to the victims' testimony; and that K.S.'s testimony would be highly prejudicial because the car incident occurred outside of the workplace and allegedly involved more serious sexual conduct than the charges involving the victims.

After extensive argument by counsel and a recess to allow it to further consider the issue, the trial court ruled to admit the proposed testimony of J.S. and K.S. In engaging in the Evidence Code section 352 "weighing process" required under Evidence Code section 1108, it found the prior alleged uncharged conduct by Hoang against J.S. and K.S.—unwanted sexual touching—was "sufficiently similar to the charged crimes of sexual battery and annoying and molesting of a child, as charged in Counts 2, 3, and 4"; the uncharged conduct was relevant to the issue of intent/mental state and was not remote in time to the charged offenses; J.S.'s testimony would be "relatively short," and also was relevant to the victims' credibility; and K.S.'s testimony would be limited to conduct that was similar to the charged offenses, and would exclude "down the throat" "kissing" "or any other behavior that is not . . . charged in this case."

   2. Guiding Principles

Character or disposition evidence is generally inadmissible to prove a defendant's conduct on a specified occasion. (Evid. Code, § 1101, subds. (a), (b).) Evidence Code section 1108 "is an exception to the general prohibition against admitting character evidence to prove criminal disposition or propensity." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 352; accord, *People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) It provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses

9

is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).) In enacting this statute, the Legislature found that "evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible without regard to the limitations of Evidence Code section 1101." (*People v. Yovanov* (1999) 69 Cal.App.4th 392, 405 (*Yovanov*); accord, *People v. Fitch* (1997) 55 Cal.App.4th 172, 179 ["Evidence of a prior sexual offense is indisputably relevant in a prosecution for another sexual offense"].)

In determining whether to admit propensity evidence under Evidence Code section 1108, a trial court weighs several factors: "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his [or her] uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117 (*Nguyen*).)

"[Evidence Code s]ection 352 articulates the general rule that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Erskine* (2019) 7 Cal.5th 279, 296.) " 'By subjecting evidence of uncharged sexual misconduct to the weighing process of [Evidence Code] section 352, the

10

Legislature has ensured that such evidence cannot be used in cases where its probative value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. [Citation.] This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.' " (*Falsetta*, *supra*, 21 Cal.4th at pp. 917–918.) We will not disturb that ruling on appeal, absent a showing that the court exercised its discretion in an "arbitrary, capricious, or patently absurd manner." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

   3.  The Propensity Evidence Was Properly Admitted

   We conclude the trial court diligently applied the *Falsetta* factors in ruling to admit the testimony of J.S. and K.S. (See *Falsetta*, *supra*, 21 Cal.4th at pp. 917–918.) The uncharged conduct by Hoang against J.S. and K.S. was similar to the charged conduct against the victims—unwanted sexual touching of young female employees he hired and managed. J.S. testified that while working at the Restaurant, Hoang during "every shift" kissed her and/or touched her buttocks, "private area," and breasts through her clothing. At times he also would come up behind her and lean into her, causing his penis to touch her "butt area."

   Doe 1's testimony was similar. While working at the Restaurant, she estimated Hoang kissed her on the cheek about 100 times; tried to kiss her on the lips about 10 or 15 times; touched her buttocks about 35 to 40 times; and also touched her "front part," which she described as her vagina. As Hoang did with J.S., he also rubbed his penis in between Doe 1's "butt," which she estimated occurred between five and 10 times.

   J.S.'s testimony was therefore highly probative as to counts 2 and 3, which required proof that Hoang touched Doe 1 for the purpose of "sexual

11

arousal, sexual gratification, or sexual abuse." (See § 243.4, subd. (e) ["(1) Any person who touches an intimate part of another person, if the touching is against the will of the person touched, and is for the specific purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of misdemeanor sexual battery . . . . [¶] (2) As used in this subdivision, 'touches' means physical contact with another person, whether accomplished directly, through the clothing of the person committing the offense, or though the clothing of the victim."]; see also CALCRIM No. 938 [given as modified by the trial court].)

Likewise, K.S.'s testimony that she saw Hoang trying to kiss Doe 1 in the Restaurant; that he also kissed K.S. multiple times, as J.S. testified; and that K.S. herself was groped by him in the car after one of their shifts, was also probative to establish his touching of Doe 1 was for the purpose of "sexual arousal, sexual gratification, or sexual abuse." (See *People v. Branch* (2001) 91 Cal.App.4th 274, 285 (*Branch*) ["[I]f the prior offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses."].)

The testimony of J.S. and K.S. was also probative as to count 4 involving Doe 2. To prove count 4, among other elements the People were required to establish that Hoang was "motivated by an unnatural or abnormal sexual interest in children." (See § 647.6, subd. (a)(1) ["Every person who annoys or molests any child under 18 years of age shall be punished by a fine not exceeding five thousand dollars ($5,000), by imprisonment in a county jail not exceeding one year, or by both the fine and imprisonment."]; see also CALCRIM No. 1122 [including the requirement that the "defendant's conduct was motivated by an unnatural or abnormal sexual interest in the child"].)

12

Both J.S. and K.S., as well as Doe 2, were 17 years old when hired by Hoang; and he clearly showed and expressed a "sexual interest" in all three of them. (See *People v. Lopez* (1998) 19 Cal.4th 282, 289–290 [for purposes of this crime, "annoy" and "molest" "are synonymous and generally refer to conduct designed to disturb, irritate, offend, injure, or at least tend to injure, another person"; and "forbidden annoyance or molestation is not concerned with [a person's] state of mind, but rather refers to the defendant's objectionable acts that constitute the offense"].)

In addition, the testimony of J.S. and K.S. was relevant under Evidence Code section 1101 to establish a common plan or scheme by Hoang—hiring young females and befriending them, including asking them to dinner, taking them home after work, and calling, messaging, or contacting them outside of work; and after grooming them, using his position and authority as their manager to touch them sexually. The uncharged conduct was likewise highly probative to establish his lack of mistake or accident when he touched the victims in a sexual manner. (See *Branch*, *supra*, 91 Cal.App.4th at pp. 281–282 [trial court properly admitted the testimony of a victim of a prior uncharged sexual assault committed by the defendant as evidence of intent, a common plan or scheme, and the absence of mistake or accident on the defendant's part—"molesting 12-year-old girls in his home"].)

Moreover, all the incidents of Hoang's uncharged sexual conduct involving J.S. and K.S. occurred during the same general time frame as the charges in counts 2, 3, and 4. J.S. also witnessed Hoang's touching of Doe 1 during their shifts at the Restaurant, thereby corroborating Doe 1's testimony; and K.S. also worked at the Restaurant at the same time as Doe 1 and J.S. Thus, the uncharged offenses were close in time to the charged offenses. (See *Nguyen*, *supra*, 184 Cal.App.4th at p. 1117 [concluding a 13- to

13

17-year gap between the uncharged and charged sexual offenses did not render the propensity evidence inadmissible]; *Branch*, *supra*, 91 Cal.App.4th at p. 282 [20-year gap between the uncharged and charged offenses].)

The record also shows neither the testimony of J.S. nor K.S. consumed significant trial time. (See Evid. Code, § 352 [the trial court may "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time"].) And the uncharged sexual conduct did not "create substantial danger of undue prejudice," despite Hoang's argument to the contrary. (See *id.*, subd. (b).)

Indeed, K.S.'s testimony that Hoang pulled down her shirt, put his mouth on her breast, and unbuckled her pants, was no more inflammatory than the testimony of Doe 1, who stated Hoang kissed her about 100 times; touched her buttocks about 35 to 40 times and her vagina a few times; and rubbed his penis in "between her butt" between five and 10 times.

What's more, Hoang made sexually explicit comments to Doe 1 including asking why she would not kiss him; telling her he wanted to "touch," "feel," and "taste [her]"; and asking how much she would "cost" to have " 'sex' " with him. He also made similar comments and statements to Doe 3, including asking her to have sex with him; inquiring how many "guys [she had] slept with"; and accusing her of taking a condom from his car, which he claimed to have used to "jack[ ]off" as he looked at a photograph of her on his cellphone. Hoang's sex acts with K.S. in the car after work were no more inflammatory than his sexualized conduct toward, *and* statements to, the victims of the charged crimes.

In any event, even when there may be factual dissimilarities between the charged and uncharged sexual conduct, as Hoang argues, "[a]ny dissimilarities in the alleged incidents relate only to the weight of the

14

evidence, not its admissibility." (See *People v. Hernandez* (2011) 200 Cal.App.4th 953, 967; *People v. Cordova* (2015) 62 Cal.4th 104, 133 [dissimilarity alone does not compel exclusion of evidence of prior sexual offenses]; see also *Yovanov, supra*, 69 Cal.App.4th at p. 405 [Evidence Code section 1108 evidence is *presumed* admissible].)

Finally, we reject Hoang's contention that the evidence of uncharged conduct confused, distracted, or misled the jury. For one thing, the jury was specifically instructed under CALCRIM No. 1191 that, even if it found Hoang committed the uncharged sexual conduct, "that conclusion is only one factor to consider along with all the other evidence"; that such conduct "is not sufficient by itself to prove that the defendant is guilty of sexual battery against Jane Doe 1 as charged in counts 2 and 3, and annoying or molesting of a child against Jane Doe 2 as charged in count 4"; and that the "People must still prove each charge beyond a reasonable doubt."

With respect to the prior sexual offense evidence instruction, our Supreme Court has stated, "This instruction will help assure that the defendant will not be convicted of the charged offense merely because the evidence of his [or her] other offenses indicates he [or she] is a 'bad person' with a criminal disposition." (*Falsetta, supra,* 21 Cal.4th at p. 920.) The jury is presumed to have followed the instruction "in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tabin* (2010) 50 Cal.4th 99, 196 (*Letner and Tabin*); accord, *People v. McKinnon* (2011) 52 Cal.4th 610, 670 ["We 'credit jurors with intelligence and common sense' [citation] and presume they generally understand and follow instructions[.]"].)

For another thing, there does not appear to be any factual basis in the record to support Hoang's contention that the jury was confused or misled by

15

evidence of the uncharged conduct (see *Letner and Tabin*, *supra*, 50 Cal.4th at p. 196); nor does it appear that Hoang pointed us to any (see California Rules of Court, rule 8.204(a)(1)(C) [briefs must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"]).  And we note that, despite the introduction of evidence of uncharged sexual conduct, the jury deadlocked on count 4 involving Doe 2, which count was ultimately dismissed by the prosecution.  The jury's refusal to convict Hoang on count 4 supports the reasonable inference that it followed CALCRIM No. 1191 and did not "punish" him merely because he was not charged for his sexual conduct against J.S. and/or K.S.

In sum, for all these reasons, and because our Supreme Court has held that Evidence Code section 1108 does not offend due process, as Hoang also contends (see *Falsetta*, *supra*, 21 Cal.4th at p. 916), we conclude the trial court did not err in admitting the testimony of J.S. and K.S.[4]

---

[4]     In light of our decision to address this issue on the merits, we deem it unnecessary to decide the People's alternate contention that Hoang forfeited his challenge to K.S.'s testimony based on his failure to object to it during trial.  (See *People v. Holloway* (2004) 33 Cal.4th 96, 133 ["A tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself."])  As a result, we conclude it also is unnecessary to decide Hoang's contention that defense counsel was allegedly ineffective for failing to object to such trial testimony.  (See *People v. Crittenden* (1994) 9 Cal.4th 83, 146 (*Crittenden*) [reviewing court may exercise discretion to consider potentially forfeited claims to forestall ineffective assistance of counsel argument].)

B. *Lesser Included Offense Instruction on Count 1*

Hoang next contends the trial court erred by failing to instruct sua sponte on count 1 with the lesser included offense of misdemeanor false imprisonment. We disagree.

1. Guiding Principles

A court is required to instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. (*People v. Moon* (2005) 37 Cal.4th 1, 25.) This obligation extends to lesser included offenses "if substantial evidence exists indicating that the defendant is guilty *only* of the lesser offense." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584 (*Manriquez*), italics added; accord, *People v. Valdez* (2004) 32 Cal.4th 73, 116 (*Valdez*) ["[S]ubstantial evidence must exist to allow a reasonable jury to find that the defendant is guilty of a lesser but not the greater offense."].)

Section 236 defines false imprisonment as "the unlawful violation of the personal liberty of another." Section 237 provides that punishment for false imprisonment may either be a fine not exceeding $1,000 or by imprisonment in the county jail for not more than one year or both, except where "such false imprisonment [is] effected by violence, menace, fraud, or deceit . . . ." In the latter circumstance, false imprisonment is a felony and is "punishable by imprisonment in the state prison." (§ 237, subd. (a).)

The distinction between felony and misdemeanor false imprisonment depends on the amount of force used. (*People v. Castro* (2006) 138 Cal.App.4th 137, 140 (*Castro*).) Misdemeanor false imprisonment, which is a lesser included offense of felony false imprisonment (*People v. Babich* (1993) 14 Cal.App.4th 801, 806), becomes a felony "only where the force used is greater than that reasonably necessary to effect the restraint. In such

17

circumstances, the force is defined as 'violence' with the false imprisonment effected by such violence a felony." (*People v. Hendrix* (1992) 8 Cal.App.4th 1458, 1462 (*Hendrix*).) We independently review the question of whether the trial court failed to instruct on a lesser included offense. (*People v. Avila* (2009) 46 Cal.4th 680, 705 (*Avila*).)

The trial court here instructed the jury with CALCRIM No. 1240: "The defendant is charged in Count 1 with false imprisonment by violence or menace against Jane Doe 3, in violation of Penal Code section 236. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] (1) The defendant intentionally restrained or confined Jane Doe 3 or caused Jane Doe 3 to be restrained or confined or detained by violence or menace; AND [¶] (2) The defendant made Jane Doe 3 stay or go somewhere against her will. [¶] *Violence* means using physical force that is greater than the force reasonably necessary to restrain someone. [¶] *Menace* means a verbal or physical threat of harm. The threat of harm may be express or implied. [¶] An act is *against a person's will* if that person does not consent to the act. In order to *consent*, a person must act freely and voluntarily and know the nature of the act. [¶] False imprisonment does not require that the person restrained be confined in jail or prison."

2. <u>No Sua Sponte Instruction Was Required</u>

Substantial evidence supports the jury's finding on count 1 that Hoang used physical force greater than the force reasonably necessary to restrain Doe 3 when she attempted to walk out of the Restaurant, after she grew tired of his sexually explicit comments. She testified he came from behind, grabbed her arms, and held her against her will; that she attempted to escape his grip by kicking and hitting him but was unable to do so; that instead of letting her go, he used *additional* force to hold her even *tighter*,

18

despite the fact his initial use of force had been sufficient to restrain her; that he outweighed and was much stronger than her; that he restrained her with such force that she suffered bruises on her arm; and that he even admitted he was "too aggressive" in restraining her and had "hurt" her.

From this evidence, a jury could reasonably infer that Hoang used more force than reasonably necessary to restrain Doe 3. (See *Castro*, *supra*, 138 Cal.App.4th at p. 140; *Hendrix*, *supra*, 8 Cal.App.4th at p. 1462.) As such, there was no substantial evidence that he was *only* guilty of the lesser misdemeanor offense and not the greater felony offense. (See *Manriquez*, *supra*, 37 Cal.4th at p. 584; *Valdez*, *supra*, 32 Cal.4th at p. 116; see also *Avila*, *supra*, 46 Cal.4th at p. 705 ["This substantial evidence requirement is not satisfied by ' "*any* evidence . . . no matter how weak," ' but rather by evidence from which a jury composed of reasonable persons could conclude 'that the lesser offense, but not the greater, was committed.' "].) The trial court therefore did not err in failing to instruct sua sponte on the lesser offense of misdemeanor false imprisonment.[5]

---

[5] In light of our conclusion, we deem it unnecessary to address the People's contention that (1) the offense of misdemeanor false imprisonment was barred by the applicable statute of limitations; and (2) Hoang forfeited this issue on appeal by failing to request (i) a waiver of the statute of limitations and (ii) an instruction on this lesser included offense. We therefore also deem it unnecessary to address Hoang's contention he was prejudiced by the trial court's failure to instruct on this lesser included offense or that he allegedly received ineffective assistance as a result of counsel's failure to seek such a waiver and specifically request such an instruction. (See *Crittenden*, *supra*, 9 Cal.4th at p. 146.)

## DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

BUCHANAN, J.

CASTILLO, J.